IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THOMAS J. KELLY,              )
                                    )
        Plaintiff,           )
                                      )
      v.                     )     Civil Action No. 09-759-RGA-SRF
                                      )
CAROLYN W. COLVIN,      )
Commissioner of Social Security,   )
                                      )
        Defendant.      )

## **REPORT AND RECOMMENDATION**

Plaintiff Thomas J. Kelly ("Kelly" or "Plaintiff") appeals from a decision of Carolyn W.

Colvin, the Commissioner of Social Security (the "Commissioner" or "Defendant"),[1] denying his

application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 401-433. The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[2]

Presently pending before the court are cross-motions for summary judgment filed by

Kelly and the Commissioner. (D.I. 19, 23) Kelly asks the court for an award of benefits, or

alternatively, to remand to the Commissioner for further administrative proceedings. (D.I. 20)

---

[1] Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

[2] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

The Commissioner requests that the ALJ's decision be affirmed. (D.I. 24) For the reasons set forth below, I recommend that the court grant Kelly's motion, deny the Commissioner's motion, and remand this matter for further proceedings.

## I.   BACKGROUND

### A.   Procedural History

Kelly filed his application for DIB on July 22, 2005, alleging disability beginning on May 1, 2003. (D.I. 15 at 124-29, 145-53) Kelly later amended his onset date to June 30, 2005. (*Id.* at 123) Kelly's claim was denied initially on December 29, 2005, and upon reconsideration on November 16, 2006. (*Id.* at 94-98, 102-06) On December 19, 2006, Kelly filed a request for a hearing before an administrative law judge. (*Id.* at 107-08) The hearing was held on February 20, 2008 before administrative law judge Judith A. Showalter (the "ALJ"). (*Id.* at 114-20) On April 9, 2008, the ALJ issued a decision confirming the denial of benefits to Kelly. (*Id.* at 8-25)

Kelly requested a review of the ALJ's decision by the Appeals Council on April 24, 2008. (*Id.* at 5-7) The Appeals Council denied Kelly's request for review on September 11, 2009. (*Id.* at 1-4) The April 9, 2008 decision of the ALJ therefore became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On October 12, 2009, Kelly filed a complaint seeking judicial review of the ALJ's decision. (D.I. 2) On September 1, 2011, Kelly filed his motion for summary judgment. (D.I. 19) The Commissioner opposed Kelly's motion and filed a cross-motion for summary judgment on November 3, 2011. (D.I. 23) On April 26, 2012, this case was referred to the Magistrate Judge to hear and resolve all pretrial matters.

## B. Factual Background

### 1. Medical History

Kelly was fifty-three years old when the ALJ rendered her decision. (D.I. 15 at 12, 33) He has a high school education and a two-year college degree. (*Id.* at 35-36) He has not worked since 2003, when he was employed as a roofing foreman. (*Id.* at 38) Kelly alleges disability due to ADHD, arthritis, depression, compulsive anxiety, and pain in his neck and left shoulder. (*Id.* at 146)

#### a. Substance abuse

Kelly treated with his primary care physician, A. Douglas Chervenak, D.O., since 1999 for various conditions, including substance abuse. (*Id.* at 276-93) On May 24, 2003, Dr. Chervenak indicated that Kelly had been drinking heavily for about a month, three to four days a week. (*Id.* at 286) He smoked two and a half packs of cigarettes per day. (*Id.*) In December 2003, Dr. Chervenak noted that Kelly continued to drink, had obtained several DUI's, and was attending Kent County Counseling. (*Id.* at 285)

On June 2, 2004, Kelly was admitted to the emergency room of Kent General Hospital after suffering a fall while intoxicated. (*Id.* at 264-69) A CT scan revealed no skull fracture or extracranial soft tissue swelling. (*Id.* at 269) Kelly tested positive for alcohol. (*Id.* at 264-69)

Kelly began treating with psychiatrist Yvette Baker, M.D. on June 23, 2004 for his alcohol dependence, among other conditions. (*Id.* at 270-72) On June 24, 2005, Dr. Baker indicated that Kelly had served six months in jail due to a DUI conviction, but he had been clean for a year and had been attending Alcoholics Anonymous meetings four times a week. (*Id.* at 225) On July 19, 2005, Dr. Baker noted that Kelly was still adjusting to life outside of jail following his DUI conviction, but he was making progress. (*Id.* at 223) From September to

3

November 2005, Dr. Baker observed that Kelly attended his meetings and was doing well. (*Id.* at 222-23) According to Dr. Baker, Kelly experienced cravings and dreams that he was using again. (*Id.* at 224) However, Dr. Baker indicated that Kelly's alcoholism was in remission as of November 7, 2005. (*Id.*)

### b. Mental conditions

Dr. Chervenak also noted Kelly's history of depression. (*Id.* at 276-93) In June 2000, Dr. Chervenak prescribed Effexor to treat Kelly's depression and anxiety. (*Id.* at 288) He noted that Kelly was sleeping better and seemed calmer at his next visit later that month. (*Id.*) Dr. Chervenak prescribed Zoloft beginning in December 2003 after noting that Kelly had been drinking and obtained a few DUI's. (*Id.* at 283, 285)

From 2004 to 2006, Kelly treated with Dr. Baker for major depressive disorder, attention deficit hyperactivity disorder ("ADHD"), and recurrent and generalized anxiety disorder. (*Id.* at 270-72) On June 23, 2004, Dr. Baker noted that Kelly worried about his finances, his wife's unemployment, the children he and his wife cared for, and the loss of his driver's license. (*Id.* at 270) Kelly informed Dr. Baker that his sleep was okay at that time and his appetite was good. (*Id.*) Dr. Baker described Kelly's mood as overwhelmed. (*Id.* at 271) Dr. Baker prescribed Librium and Zoloft to control Kelly's anxiety and depression at the June 2004 visit, and measured his global assessment of functioning ("GAF") score at 61. (*Id.* at 272)

On June 24, 2005, Dr. Baker measured Kelly's GAF score at 62. At Kelly's next visit on July 19, 2005, Dr. Baker noted that Kelly was anxious, but his mood and anxiety were stabilizing, and he continued to take his medications. (*Id.* at 223) On October 10, 2005, Dr. Baker indicated continued improvement, described Kelly's mood and anxiety levels as stable, and continued his medications. (*Id.*) Later that month, Dr. Baker observed that Kelly was better

4

on his medication, and the addition of Strattera to his medications had helped his organization. (*Id.* at 224) She indicated that he was calmer and his mood and anxiety remained stable. (*Id.*) On November 28, 2005, Dr. Baker indicated that Kelly experienced some forgetfulness and mild anxiety but was otherwise doing well. (*Id.*)

From December 2005 through February 2006, Dr. Baker met with Kelly four times and concluded that Kelly was doing fine, but had some increase in anxiety and mild depression due to the fact that he was caring for a friend's son. (*Id.* at 219, 224) Dr. Baker increased Kelly's prescription of Lexapro in December 2005. (*Id.* at 224) On June 13, 2006, Dr. Baker concluded that he was "doing ok," and was calmer, but still tense. (*Id.* at 217) She identified his anxiety as stable. (*Id.*) Dr. Baker measured Kelly's GAF score at 61 during this visit. (*Id.* at 272)

Dr. Baker performed an assessment of Kelly on February 15, 2008 prior to his hearing before the ALJ and rated his GAF score at 63. (*Id.* at 318) She indicated that Kelly was currently taking Lexapro, Adderall, and Librium, and noted that while there was minimal improvement in his mood, he had not relapsed and his ADHD symptoms had subsided. (*Id.* at 319) Dr. Baker indicated that Kelly's chances of complete recovery were poor to fair. (*Id.*) According to Dr. Baker, Kelly's conditions would cause him to be absent from work more than three times per month. (*Id.* at 320)

### c.    Physical conditions

On January 22, 2002, Kelly visited Dr. Chervenak and reported that he had been experiencing back pain since January 17, 2002. (*Id.* at 287) Dr. Chervenak evaluated Kelly again on May 24, 2003, and observed that Kelly experienced some tenderness to the touch on his spine. (*Id.* at 286) Dr. Chervenak indicated that Kelly complained of occasional back pain which grew worse during inclement weather. (*Id.*) On April 20, 2004, Kelly saw Dr. Chervenak

5

with complaints of lower back pain which had lasted for about three days. (*Id.* at 281) At another visit shortly thereafter on April 27, 2004, Kelly made no mention of his back pain.[3] (*Id.*)

Subsequent treatment notes from June and July 2004 indicate that Kelly complained of an infected and swollen right foot. (*Id.* at 279) Dr. Chervenak recommended elevation and soaking. (*Id.*) These notes reflect no further complaints regarding back pain.

Kelly visited Dr. Chervenak three times after his disability onset date. In June 2005, Dr. Chervenak treated Kelly for a rash on his hands and feet. (*Id.* at 277) The condition did not improve by the end of July 2005, and Dr. Chervenak referred Kelly to a dermatologist. (*Id.*) In October 2005, Dr. Chervenak noted that Kelly's hands were better, but Kelly had not gone to the dermatologist. (*Id.* at 276) These treatment notes contain no reference to ongoing back pain.

### d.    Non-treating physicians

The record contains various opinions and evaluations of Kelly from non-treating physicians, including state agency doctors. On November 15, 2005, Kelly visited Jay Freid, M.D., for a consultative examination. (*Id.* at 184-90) Dr. Freid identified Kelly's chief complaint as back pain. (*Id.* at 184) Dr. Freid determined that Kelly suffers from chronic cervical and lumbar pain in his muscles. (*Id.* at 185) Dr. Freid further observed that Kelly has a limited range of motion in his left thumb, he has a history of alcohol abuse, and he has obsessive compulsive disorder with a history of anxiety. (*Id.*)

On November 29, 2005, Michael Borek, D.O., a state agency medical consultant,

---

[3] In response to Kelly's complaints of rectal pain at this visit, Dr. Chervenak referred Kelly to Thomas P. Barnett, M.D. (D.I. 15 at 273-75) Kelly visited with Dr. Barnett two times in April and June of 2004, and Dr. Barnett performed a colonoscopy on June 24, 2004. (*Id.*) Dr. Chervenak's records do not reflect any referrals made for additional treatment or testing of Kelly's back, shoulder, neck, and thumb pain, nor are there any records suggesting that Kelly independently sought treatment for these conditions by a specialist during the time period in which he experienced the symptoms.

6

completed a physical residual functional capacity ("RFC") assessment of Kelly. (*Id.* at 191-98) Dr. Borek determined that Kelly could occasionally lift up to fifty pounds and frequently lift up to 25 pounds, he could stand, walk, or sit for about six hours in an eight hour workday, and he is unlimited in his ability to push or pull. (*Id.* at 192) Dr. Borek observed that Kelly had limited feeling in his left thumb and opined that he should avoid concentrated exposure to vibration, which could increase his pain. (*Id.* at 194-95) According to Dr. Borek, the severity and duration of Kelly's symptoms were disproportionate to their expected severity and duration based on Kelly's medical history, and they were inconsistent with the medical and non-medical evidence. (*Id.* at 196) On November 12, 2006, Dr. R. Palandjian conducted a medical examination of Kelly and affirmed Dr. Borek's RFC assessment dated November 29, 2005. (*Id.* at 263)

On December 16, 2005, Kelly saw Pedro M. Ferreira, Ph.D., a consultative psychologist for the Social Security Administration. (*Id.* at 213-16) Dr. Ferreira completed a mental RFC assessment and determined that Kelly suffered from depression and anxiety, but indicated that the severity of Kelly's symptoms was not supported by the psychiatric evidence. (*Id.* at 215) According to Dr. Ferreira, the record indicated that Kelly had been responding to treatment slowly but adequately. (*Id.*) Overall, Dr. Ferreira concluded that Kelly was not significantly limited by his conditions, and was only moderately limited in his ability to understand and remember instructions, maintain concentration for extended periods of time, complete a normal workday and work week, and set realistic goals. (*Id.* at 213-14) On October 26, 2006, Kelly saw Dr. D. Fugate for a second mental RFC assessment. (*Id.* at 251-53) Dr. Fugate affirmed Dr. Ferreira's RFC assessment from December 16, 2005. (*Id.* at 253)

On October 24, 2006, Kelly visited Janis Chester, M.D., for a consultative examination. (*Id.* at 229-39) Dr. Chester indicated that Kelly showed no signs or symptoms consistent with

7

ADHD, depression, bipolar disorder, or obsessive compulsive disorder. (*Id.* at 231) Dr. Chester attributed his anxiety to Kelly's cravings for drugs or alcohol and his irritation with his wife's tendency to keep a cluttered home. (*Id.*) Dr. Chester determined that Kelly's polysubstance dependence was in remission and identified a cognitive disorder likely secondary to head trauma, substance abuse, and side effects from his Librium prescription. (*Id.* at 233) Dr. Chester concluded that Kelly was not capable of managing benefit payments. (*Id.* at 236)

On October 30, 2006, Kelly visited Kartik Swaminathan, M.D., for a consultative examination. (*Id.* at 254-62) Dr. Swaminathan concluded that Kelly would be able to sit for about 30 minutes or stand for about 30 to 45 minutes before needing rest, he must work in a job that allows for constant changes in position, and he would be unable to perform any overhead activities for longer than 5 to 10 minutes as a result of his right rotator cuff tendonitis. (*Id.* at 257) According to Dr. Swaminathan, the arthritis in the small joints of Kelly's hand would prevent him from performing fine motor activities or gripping objects requiring more than 5 to 10 pounds. (*Id.*)

On July 6, 2008, Dr. Chris Schellinger, a spine specialist, conducted an independent medical evaluation of Kelly's condition. (*Id.* at 324) Dr. Schellinger observed that Kelly experienced a dull and aching pain in the neck bilaterally, which radiated to both arms and both hands. (*Id.*) He further observed that Kelly experienced dull, aching, shooting and numbing pain in the low back bilaterally, which radiated to both legs and significantly reduced his ability to carry out daily activities. (*Id.*) Dr. Schellinger noted slight restrictions in the extension, right lateral flexion, left rotation, and right rotation degrees of the cervical spine, and a mild restriction in the left lateral flexion of the cervical spine. (*Id.* at 326) He concluded that generalized spinal degeneration marked by stiffness of the vertebral joints was present, as well as extremely

8

advanced degenerative arthritis. (*Id.* at 327) He described Kelly's prognosis as fair and indicated that continued improvement was expected despite permanent residuals. (*Id.* at 328) Dr. Schellinger indicated that Kelly would be unable to perform strenuous work indefinitely. (*Id.*)

## 2. Employers' Letters

Kelly also submitted into evidence the statements of Marianne Jones and Tia-Justine G. Peters-Sievila. (*Id.* at 173-75) Ms. Jones stated that Kelly had performed some house maintenance jobs for her over the past several years even though others had warned her that he has major problems with time and distraction. (*Id.* at 173) Ms. Jones observed that Kelly was easily distracted, experienced memory issues, and had difficulty staying focused on "boring" tasks. (*Id.*) Ms. Sievila indicated that Kelly replaced a window in her home, but the job took several weeks for him to complete. (*Id.* at 174) She described Kelly as a perfectionist who would get upset if things were not exactly right, and stated that Kelly had a habit of talking to himself out loud about other tasks he felt he needed to complete. (*Id.* at 174-75) Ms. Sievila also identified Kelly as being easily distracted and forgetful. (*Id.* at 174)

## 3. The Administrative Hearing

### a. Plaintiff's Testimony

Kelly was fifty-three years old at the time of his hearing before the ALJ on February 20, 2008. (D.I. 15 at 33) At the hearing, Kelly testified that he is married and lives with his wife and his sister-in-law, who has Down Syndrome. (*Id.* at 34) Kelly's driver's license was suspended due to his multiple DUI convictions, and as a result, he relies on his wife for transportation. (*Id.* at 34-35) He is a high school graduate and completed two years of college to obtain a degree in architectural engineering technology. (*Id.*) He testified that his ability to spell

9

is weak, and he needs help to make a grocery list or fill out a job application. (*Id.* at 36)

Kelly testified that he worked as a roofer for twenty-seven years, and at one point served as a foreman who supervised up to four or five workers. (*Id.* at 36) However, he did not have the authority to hire or fire an employee without first obtaining approval from the company owner. (*Id.* at 37) When Kelly tried to work for other employers, he claims that he was fired because he did not work fast enough and did not follow instructions. (*Id.* at 83) Kelly's work involved heavy lifting and the use of power tools, and he often worked on ladders and scaffolding. (*Id.* at 37)

Kelly chose to leave his job in May of 2003 because he suffered a relapse and began using drugs and alcohol. (*Id.* at 37-38) He did not file for unemployment or look for work. (*Id.* at 38-39) He served time in prison from October 2004 to June 2005 as a result of a DUI conviction. (*Id.*) Following his release from prison in June 2005, he began treating with Dr. Baker. (*Id.* at 39)

Kelly testified that the work he performed since 2003 has been infrequent and he has not earned a substantial wage. (*Id.* at 39) He considered training to become an electrician, but is reluctant to return to the construction industry. (*Id.* at 40) He applied for a couple of vocational programs and was rejected. (*Id.* at 40) His family supports itself on the disability income received from his wife and his sister-in-law. (*Id.* at 41, 76-77)

Kelly testified that it takes him two hours to get out of bed in the morning due to the pain in his back caused by his arthritis. (*Id.* at 42) He wakes up in the morning to feed his cats, and then gets washed. (*Id.* at 74-75) He makes himself coffee, takes his vitamins, and does the dishes. (*Id.* at 75)

Kelly acknowledged that he never received treatment, surgery, or medication for his back

or neck pain. (*Id.* at 42) Kelly discovered the arthritis in his back after he fell and broke his ribs and had his spleen removed in 1999 or 2000. (*Id.*) Kelly's primary care physician, Dr. Chervenak, instructed him to perform exercises and take over-the-counter medications for his back and neck pain. (*Id.* at 43) Kelly described the pain as spreading from his right hip bone down his leg, and he testified that he has spasms in his shoulders and neck. (*Id.* at 44) On a scale of one to ten, Kelly rated the pain at a five most of the time and a ten occasionally. (*Id.*)

Kelly severed his left thumb in 1992, and the nerves continue to grow back. (*Id.* at 44, 47) He received a nine-hour operation to reattach his thumb. (*Id.* at 48) He described the pain in his thumb as constant, ranking it as a seven on a scale of one to ten. (*Id.*) Kelly testified that he primarily uses his right hand, and he is able to hold a knife and fork, hold a comb or toothbrush, and write with his right hand. (*Id.* at 49-50)

Kelly explained that he was injured in a robbery in 1989 or 1990 when a robber knocked him down from behind and kicked him in the back of the head. (*Id.* at 45) At the time, his doctors wanted to operate on him but he refused. (*Id.* at 46) He received physical therapy for a long time. (*Id.*) Kelly continues to experience pain in his neck every day, but he is able to turn his head from side to side. (*Id.* at 46-47) Kelly also testified that he had surgery on his right shoulder in 1989 and still experiences pain from the surgery. (*Id.* at 51) Kelly exercises his shoulder every day. (*Id.* at 52)

Kelly attends Alcoholics Anonymous at least five times a week and has a sponsor. (*Id.* at 54) Kelly receives counseling and therapy from Dr. Baker, who reviews his medications. (*Id.* at 56) He indicated that he pays for his visits with Dr. Baker out-of-pocket, and he no longer goes to a primary care physician. (*Id.* at 76)

Kelly continues to experience periods of depression, but has no thoughts of harming

himself. (*Id.* at 56-57) He occasionally has thoughts of harming others, and suffers from anxiety and anger. (*Id.* at 57) He has panic attacks about once or twice a month, lasting anywhere from a minute to a couple of days. (*Id.* at 61-62) However, he believes that his condition has improved since he began treating with Dr. Baker. (*Id.* at 63) He testified that writing notes to himself helps him overcome his short-term memory problems. (*Id.* at 64) Although he has trouble concentrating on the average day, he is able to concentrate on jobs if he is left alone. (*Id.* at 65)

Kelly's sleep and appetite are good sometimes and bad at other times. (*Id.* at 58) Kelly averages about four or five hours of sleep per night. (*Id.* at 70-71) He fears that people do not like him and he prefers being by himself, but he described himself as a social person who is well-liked. (*Id.* at 59) Kelly testified that he gets along with his family and has friends from his Alcoholics Anonymous group. (*Id.* at 59-60)

Kelly testified that he performs all of the household chores, including mopping, sweeping, vacuuming, laundry, and dusting. (*Id.* at 67) Kelly's wife drives him to the grocery store and he does the shopping. (*Id.* at 67-68) He cuts the grass and gardens in the warm weather. (*Id.* at 68) As a hobby, he restores yard ornaments by painting them. (*Id.* at 68-69) Kelly makes his own meals most of the time, and is able to make sandwiches and use the microwave. (*Id.* at 69-70) He is able to shower, comb his hair, dry himself, and dress. (*Id.* at 70) He tries not to lift anything over twenty or thirty pounds, but he is able to stoop to the floor and kneel down. (*Id.* at 73)

### b.   Vocational Expert's Testimony

At the administrative hearing, the ALJ heard the testimony of Jan Howard Reed ("Reed"), an impartial vocational expert (the "VE"). (*Id.* at 84-90) The VE classified Kelly's

12

prior relevant work as a roofing foreman as semi-skilled work of a medium exertional level. (*Id.* at 84) The VE opined that Kelly has no transferable skills from his previous jobs as a roofing foreman. (*Id.*)

The ALJ posed a hypothetical to the VE to assume a person who is fifty years of age and has a twelfth grade education. (*Id.* at 85-87) The hypothetical person could handle a medium level of exertion and would have limitations with the left non-dominant hand, including limited fingering in the left hand, and should avoid concentrated exposure to vibrations. (*Id.*) The hypothetical person would not be able to frequently work overhead with the upper right extremity, and would be precluded from performing his past relevant work. (*Id.*) The ALJ asked whether there would be any simple, unskilled jobs at a medium level of exertion that the hypothetical individual could perform that would not require a production pace, meaning that the individual would be paid by the piece working at an assembly line in a low stress position requiring only the occasional need to make changes or to use judgment, and only occasional interaction with co-workers and the general public. (*Id.*)

The VE responded that available jobs at a medium level of exertion included a janitor and a dishwasher, although Kelly would be unable to perform his past work with the limitations described. (*Id.* at 87) With respect to light, unskilled work that would fit within the parameters of the hypothetical, the VE listed the positions of housekeeper and inspector. (*Id.* at 87-88) The VE answered affirmatively and provided examples of four jobs: a janitor with 2,000 jobs locally and 200,000 jobs nationally, and a dishwasher with 800 jobs locally and 80,000 jobs nationally. (*Id.*) The VE testified that jobs requiring light unskilled work that would fit within the parameters of the hypothetical included a housekeeper with 3,000 jobs locally and 200,000 jobs nationally, and an inspector with 1,000 jobs locally and 70,000 jobs nationally. (*Id.*)

Kelly's counsel questioned the VE regarding whether Kelly would be able to perform any work at a level above sedentary if it was determined that Kelly had the limitations identified in the consultative examination by Dr. Swaminathan.  (*Id.* at 88)  The VE testified that if Kelly were limited to sitting for 30 minutes, standing for 30 to 45 minutes, with no overhead activity and no fine motor activities, and limited to lifting and carrying no more than five to ten pounds, Kelly would not be able to perform any work above the sedentary level.  (*Id.* at 88-89)

## C.    The ALJ's Findings

On April 9, 2008, the ALJ issued the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since June 30, 2005, the alleged amended onset date (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: lumbar and cervical degenerative disc disease, left thumb injury, depression, anxiety and attention deficit hyperactivity disorder (ADHD).  (20 C.F.R. 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform low stress, medium work as defined in 20 C.F.R. 404.1567(c) not performed at a production pace except that he could only sit for 6 hours in an 8 hour day and stand or walk for 6 hours in an 8 hour day, lifting 50 pounds occasionally, 25 pounds frequently and he should avoid concentrated exposure to vibrations with only frequent overhead work with the upper right extremity, frequent fingering with the left non-dominant hand and only occasional contact with co-workers and the general public.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.    The claimant was born on July 13, 1954 and was 50 years old, which is

14

defined as an individual closely approaching advanced age, on the alleged
amended disability onset date (20 C.F.R. 404.1563).

8.      The claimant has at least a high school education and is able to
        communicate in English (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of
        disability because using the Medical-Vocational Rules as a framework
        supports a finding that the claimant is "not disabled," whether or not the
        claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part
        404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform (20 C.F.R. 404.1560(c)
        and 404.1566).

11.     The claimant has not been under a disability, as defined in the Social
        Security Act, from June 30, 2005 through the date of this decision (20
        C.F.R. 404.1520(g)).

(D.I. 15 at 13-24)

## II.     STANDARD OF REVIEW

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Material facts are those that could affect the outcome of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)).  Pursuant to Rule

56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by

citing to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made

for the purposes of the motion only), admissions, interrogatory answers, or other materials," or

by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir.1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

## B. Review of ALJ's Findings

The court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence does not mean a large or considerable amount of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla.

16

It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the district court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. Credibility determinations are the province of the ALJ, and should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 973 (3d Cir. 1983)). The Third Circuit has explained that:

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

17

## III.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment

of insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the

Social Security Act provides for the payment of disability benefits to indigent persons under the

SSI program. 42 U.S.C. § 1382(a). A "disability" is defined as the inability to do any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). A

claimant is disabled "only if his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20,

21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28

(3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the

sequential process, the Commissioner will not review the claim further. 20 C.F.R. §

404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged

in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(1) (mandating finding of non-

disability when claimant is engaged in substantial gainful activity). If the claimant is not

engaged in substantial gainful activity, step two requires the Commissioner to determine whether

the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating that claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to his past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when a claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in

the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. Plaintiff's Arguments on Appeal

### 1. Sufficiency of the ALJ's RFC assessment

When determining a claimant's RFC, the ALJ must consider all relevant evidence. *Fargnoli*, 247 F.3d at 41; *see also* 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546. This includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41. The ALJ must provide some explanation when she has rejected relevant evidence or when there is conflicting probative evidence in the record. *See Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981). The court is "unable to conduct [its] substantial evidence review if the ALJ fails to identify the evidence he or she rejects and the reason for its rejection." *Walton v. Halter*, 243 F.3d 703, 710 (3d Cir. 2001). However, "the ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph will probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Moreover, it is not for this court to reweigh the various medical opinions in the record. *See Monsour*, 806 F.2d at 1190. Instead, the court's review is limited to determining if there is substantial evidence to support the ALJ's weighing of those opinions. *Id.*

### (a) Performing at a production pace

In support of his appeal, Kelly alleges that the ALJ erred by failing to consider the functional limitations caused by Kelly's mental impairments, which were thoroughly

documented in Dr. Baker's treatment notes. (D.I. 20 at 5) According to Kelly, the ALJ's RFC

finding failed to account for the fact that Kelly is unable to work at an appropriate pace due to

his psychological impairments. (*Id.* at 6)

A careful reading of the hypothetical question shows that the ALJ accounted for Kelly's

inability to work at a production pace, and the VE incorporated this limitation into her analysis

of jobs that Kelly is capable of performing. Specifically, the ALJ included the limitation in her

hypothetical to the VE by expressly stating as follows:

> Would there be any simple, unskilled or at a medium level of exertion such a
> person could do that would also not be at a production pace, work that would not
> be at a production pace? To me that means paid by the piece or working at an
> assembly line, low stress work, defined as only occasional need to make changes
> or to use judgment, and work that would only have occasional with co-workers
> and the general public.

(D.I. 15 at 87) The ALJ further accounted for this limitation in her decision. After considering

and rejecting the proffered statements of Ms. Jones and Ms. Sievila, the ALJ noted that,

> [a]lthough each opinion points out the claimant's difficulties with managing
> construction jobs, the undersigned assigned low stress jobs, which would not be
> performed at production pace, as part of the claimant's residual functional
> capacity. In addition, the claimant was unsupervised at each of the jobs he
> performed for Ms. Jones and Ms. Sievila. While working as a full time employee,
> the claimant would have a supervisor, who would review his work activities and
> insure [sic] that he remained on task. While Ms. Jones' and Ms. Sievila's
> opinions are helpful in determining what can occur when the claimant attempts
> jobs without supervision, they are not reflective of how the claimant can manage
> his work requirements with appropriate supervision.

(*Id.* at 18-19) The ALJ did not neglect to consider the limitations stemming from Kelly's mental

impairments, as evidenced by the fact that she expressly included a limitation relating to Kelly's

inability to work at a production pace in her RFC finding after considering the record evidence

from Dr. Baker and Kelly's previous employers. The ALJ's hypothetical accurately conveyed

the disputed limitation relating to production pace as required by the Third Circuit. *See*

21

*Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).

### (b) Degenerative disc disease

Kelly further contends that the ALJ correctly identified Kelly's degenerative disc disease as a severe impairment, but failed to include restrictions associated with his degenerative disc disease in her RFC assessment and in the hypothetical posed to the VE. (*Id.* at 8) Specifically, Kelly alleges that the ALJ erred by failing to impose restrictions on Kelly's ability to stoop, bend, turn his head, or reach with his left arm.[4] (*Id.* at 9) According to Kelly, a finding that an impairment is severe necessarily leads to an inclusion of limitations concerning the impairment in the RFC assessment. (*Id.* at 8)

As a preliminary matter, "[i]n determining a claimant's RFC, the ALJ is only required to include limitations credibly established by the evidence, not every limitation alleged." *Scandone v. Astrue*, 2011 WL 3652476, at *11-12 (E.D. Pa. 2011) (concluding that the claimant's severe impairment did not necessarily entitle her to an RFC assessment accounting for that impairment if the ALJ concludes that no functional limitations stem from that impairment). Accordingly, a finding of a severe impairment does not automatically lead to the inclusion of limitations resulting from the severe impairment in the RFC assessment.

In the present matter, the court is unable to reach the substantial evidence inquiry because the ALJ did not adequately explain why she discredited limitations that were medically supported but were contradicted by other evidence in the record. *See id.* (citing *Dyson v. Astrue*, C.A. No. 09-3846, 2010 WL 2640143, at * (E.D. Pa. June 30, 2010)). The ALJ acknowledged that Dr. Freid's opinion regarding Kelly's degenerative disc disease conflicted with Dr. Swaminathan's opinion regarding the same condition. (D.I. 15 at 18) In concluding that no

---

[4] Nothing in the record suggests that Kelly's ability to reach with his left arm is

limitations resulting from Kelly's degenerative disc disease were supported by the record, the

ALJ emphasized that no objective medical evidence supported Dr. Swaminathan's opinion. (*Id.*)

However, Dr. Swaminathan conducted objective medical tests and determined that Kelly

experienced diffuse tenderness and his range of motion in his cervical and lumbar spine was

restricted.[5] (*Id.* at 256, 260); *see Masher v. Astrue*, 354 F. App'x 623, 626 (3d Cir. 2009)

("These complaints were consistent with the results of Dr. Togut's objective tests. For example,

range of motion in Masher's neck was reduced compared to April 2004 . . ."); *Batts v. Barnhart*,

2002 WL 32345745, at *11 (E.D. Pa. Mar. 29, 2002) (observing that one doctor described

claimant's pain without documenting objective findings relating to the symptoms, such as

decreased range of motion, motor strength, and tenderness to palpitation). Most notably, Dr.

Swaminathan's objective medical testing revealed that Kelly had a limited range of motion in his

neck, a conclusion supported by Kelly's testimony during the hearing before the ALJ.[6] (*Id.* at

260)

    In light of the fact that Dr. Swaminathan conducted objective medical tests to assess

Kelly's condition, the ALJ's reasoning that Dr. Swaminathan's opinion is unsupported by

---

compromised.

    [5] Dr. Swaminathan indicated the degree to which Kelly's range of motion extended for each area of the lumbar and cervical spine. (*Id.* at 260) Dr. Freid completed a similar chart using only slash marks, with no indication of the degree to which Kelly's range of motion extended. (*Id.* at 188)

    [6] Kelly responded affirmatively to questions from the ALJ regarding whether he could move his neck. However, his responses suggested that any motion in his neck was severely limited:

    ALJ: Can you turn your head from side to side?

    Kelly: I can, well I get it so far this side, a little this way, but –

    ALJ: Okay.

    Kelly: -- you know. I can feel it. It cracks, it clicks on me.

    ALJ: And can you look up and down?

    Kelly: Yeah. I can look up and down if I use my eyes.

(D.I. 15 at 47)

objective medical evidence is flawed. The court is "unable to conduct [its] substantial evidence review if the ALJ fails to identify the evidence he or she rejects and the reason for its rejection." *Walton v. Halter*, 243 F.3d 703, 710 (3d Cir. 2001). Therefore, the court must remand the action to the ALJ for a valid explanation of why the objective medical evidence on the record regarding limitations stemming from Kelly's degenerative disc disease should be rejected.

### (c) Financial limitations

Next, Kelly argues that the ALJ failed to account for the fact that Kelly's treatment of his physical impairments was hampered by his financial situation, including his lack of health insurance and his inability to qualify for free programs. (D.I. 20 at 9)

The authority cited by Kelly indicates that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ." SSR 96-7p, 1996 WL 374186, at *7-8; *see also Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (addressing infrequency of claimant's medical visits). In the present case, Kelly visited Dr. Chervenak on a regular basis over the course of several years, but he only raised complaints about his back pain on two occasions in January 2002 and April 2004. (D.I. 15 at 286-87) Contrary to Kelly's contentions, he did not fail to seek regular medical treatment due to his financial condition. Rather, he sought medical treatment on a regular basis for a period of time, and during that time, only twice complained of back pain.

In the same vein, Kelly cites authority indicating that a claimant should not be penalized for failure to undergo treatment that the claimant cannot afford. This authority is likewise distinguishable from the facts of the present case. A claimant may refuse to accept prescribed treatment if "[t]he individual is unable to afford prescribed treatment which he or she is willing

24

to accept, but for which free community resources are unavailable." SSR 82-59, 1982 WL

31384, at *4. In the present case, Dr. Chervenak told Kelly to perform exercises and instructed

him to use over-the-counter medications to alleviate his back pain. There is no evidence on the

record suggesting that Dr. Chervenak instructed Kelly to take prescription pain medication that

Kelly could not afford, nor is there evidence that Dr. Chervenak referred Kelly to a specialist or

ordered him to undergo medical tests. The authority cited by Kelly refers to a claimant's ability

to afford prescribed treatment, but no additional treatment was prescribed in this instance.

Therefore, the ALJ did not err in failing to account for Kelly's financial circumstances.

Within Kelly's argument regarding his financial condition, Kelly briefly raises a new

evidence argument, contending that his visit with Dr. Schellinger following the hearing before

the ALJ revealed advanced spondylosis, L5 marked intervertebral disc space narrowing,

extremely advanced degenerative arthritis, a goose neck deformity, and a positive rheumatoid

factor. (D.I. 20 at 11) According to Kelly, this evidence is based on objective medical testing,

and the results support Dr. Swaminathan's opinion which was rejected by the ALJ.

If a plaintiff proffers evidence in the district court that was not previously presented to

the ALJ, then the district court may remand to the Commissioner pursuant to the sixth sentence

of § 405(g) ("Sentence Six"). *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Sentence

Six provides as follows:

> The court may, on motion of the Commissioner of Social Security made for good
> cause shown before the Commissioner files the Commissioner's answer, remand
> the case to the Commissioner of Social Security for further action by the
> Commissioner of Social Security, and it may at any time order additional
> evidence to be taken before the Commissioner of Social Security, but only upon a
> showing that there is new evidence which is material and that there is good cause
> for the failure to incorporate such evidence into the record in a prior proceeding;
> and the Commissioner of Social Security shall, after the case is remanded, and
> after hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact and decision, and a transcript of the additional

> record and testimony upon which the Commissioner's action in modifying or
> affirming was based.

§ 405(g). When a plaintiff seeks to rely on evidence that was not before the ALJ, the district

court may remand the case to the Commissioner only if: (1) the evidence is new; (2) the evidence

is material; and (3) good cause exists as to why the evidence was not previously presented to the

ALJ. *Matthews*, 239 F.3d at 592; *see also Szubak v. Sec. of Health & Human Servs.*, 745 F.2d

831, 833 (3d Cir. 1984). Where, as here, the Appeals Council receives the new evidence

following the ALJ's determination but denies review, the district court "is confined to review

evidence that was available to the [ALJ], and to determine whether the decision of the [ALJ] is

supported by substantial evidence." *Wyatt v. Sec. of Health & Human Servs.*, 974 F.2d 680, 685

(6th Cir. 1993); *see also Matthews*, 239 F.3d at 590.

The purpose of the new evidence rule is to give the plaintiff an opportunity to present

new and material evidence for consideration by the Appeals Council in deciding whether to grant

review of the ALJ's decision. *See Matthews*, 239 F.3d at 594. This supports the policy of giving

the claimant ample opportunity to prove his or her disability. *Id.* However, "evidence that was

not before the ALJ cannot be used to argue that the ALJ's decision was not supported by

substantial evidence." *Id.* (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991)).

The district court has no statutory authority to review the Appeals Council decision to

deny review. *Id.* Instead, the Social Security Act gives the district court authority to remand the

case to the Commissioner if the plaintiff has shown good cause why such new and material

evidence was not presented to the ALJ. *Id.* A remand for "new evidence," without requiring

some justification for not having offered that evidence at the initial hearing, could "turn the

procedure into an informal, end-run method of appealing an adverse ruling by the Secretary."

*Szubak*, 745 F.2d at 834. The court may not consider the effect of the new evidence on the

substantiality of the evidence previously presented to the ALJ. *Matthews*, 239 F.3d at 594.

In keeping with Third Circuit precedent on this matter, I recommend that the court decline to review or remand for consideration the additional evidence that Kelly submitted to the Appeals Council. Kelly failed to show good cause for not presenting the evidence to the ALJ, and has offered no explanation for why he did not attempt to obtain an evaluation from a spine specialist at a time when it could be considered by the ALJ.

### (d)     Reliance on out-of-date opinion

Finally, Kelly alleges that the ALJ erred in relying exclusively upon an out-of-date, non-examining state agency opinion to support her RFC assessment. (D.I. 20 at 11) According to Kelly, the opinion was rendered well before the record was complete, and it is inconsistent with Dr. Swaminathan's more recent opinion following his physical examination of Kelly, which revealed diffuse tenderness and decreased range of motion in the cervical spine, swelling of the joints in his hands, decreased grip strength, positive left Tinel's sign, diffuse lumbar spine tenderness, decreased lumbar lordosis, and terminally restricted range of motion. (*Id.* at 11-12)

Kelly cannot prevail on his argument that Dr. Freid's opinion is stale. The Third Circuit has specifically noted that, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012).

Dr. Freid issued his opinion on November 15, 2005. (D.I. 15 at 184) All of the relevant treatment notes from Dr. Chervenak, Kelly's only treating physician for his back condition, predate Dr. Freid's opinion. (*Id.* at 276-93) The record reflects that Kelly stopped treating with Dr. Chervenak for his back pain after April 2004, and Kelly's degenerative disc disease has gone

untreated since that time. (*Id.*) In light of the fact that the Third Circuit imposes no limits on the amount of time that passes between a non-treating physician's report and the ALJ's reliance on it, the ALJ was not required to reject Dr. Freid's report based on its age.

This case is distinguishable from authority assessing the staleness of a consulting physician's opinion because Dr. Chervenak's records do not suggest that Kelly's condition progressed after Dr. Freid issued his report. *Cf. Foley v. Barnhart*, 432 F. Supp. 2d 465, 476 (M.D. Pa. 2005). In the present case, there are no treatment notes in the record indicating that Kelly's degenerative disc disease progressed after Dr. Freid's report was made.

## 2. Treating physicians' opinions

The Third Circuit subscribes to the "treating physician doctrine." *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). Consistent with this rule, a treating physician's opinion is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with the other substantial evidence in the record." *Fargnoli*, 247 F.3d at 43. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (internal citation omitted).

When there is medical evidence contradicting the treating physician's view, and an ALJ decides to give controlling weight to the views of another physician, the ALJ must carefully evaluate how much weight to accord the treating physician. *See Gonzalez*, 537 F. Supp. 2d at 660. If the ALJ rejects the treating physician's assessment, she may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on

the basis of contradictory medical evidence." *Plummer*, 186 F.3d at 429. The ALJ "may choose

whom to credit, but cannot reject evidence for no reason or the wrong reason." *Id.* (citation

omitted). If a treating physician's opinion is not given controlling weight, the ALJ should

consider numerous factors in determining the weight to give it, including:

> (1) the examining relationship – more weight is given to the opinion of a source
> that has examined a plaintiff as compared to a source that has not; (2) the length,
> nature and extent of the treatment relationship – more weight is given to the
> opinion of treating sources since these professionals are most able to provide a
> detailed and longitudinal picture of a plaintiff's medical history; (3) the
> supportability of the opinion – more weight is given to opinions that are well
> explained and supported with clinical or diagnostic findings; (4) the consistency
> of the opinion – more weight is given to opinions that are more consistent with
> the record as a whole; (5) specialization – opinions of specialists are given more
> weight; and (6) other factors which tend to support or contradict an opinion.

*Conn v. Astrue*, 852 F. Supp. 2d 517, 525-26 (D. Del. 2012) (citing 20 C.F.R. § 404.1527(d)).

Further, when the ALJ's decision is to deny benefits, the notice of the determination must:

> contain specific reasons for the weight given to the treating source's medical
> opinion, supported by substantial evidence in the case record and must be
> sufficiently specific to make clear to any subsequent reviewers the weight the
> adjudicator gave the treating source's medical opinion and the reasons for that
> weight.

S.S.R. 96-2p, 1996 WL 374188, at *5.

Kelly argues that the ALJ failed to give controlling weight to his treating physicians, in

violation of the treating physician rule. (D.I. 20 at 12-15) According to Kelly, the ALJ

improperly rejected the opinions of Dr. Baker and Dr. Chervenak despite the fact that their

opinions are supported by their contemporaneous office notes and the record as a whole. (D.I.

20 at 13) Specifically, Kelly alleges that the ALJ violated her obligations by neglecting to

recontact Kelly's treating physicians to obtain additional information necessary to her disability

determination. (*Id.* at 14)

It is the ALJ's duty to ensure that the administrative record is fully developed. *See* 20

C.F.R. § 404.1512(e)(1);[7] *see also Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005);

*Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (concluding that ALJ failed to ensure record

was fully developed where treating physician's treatment notes were illegible). Specifically, an

ALJ has a duty to recontact a treating medical source to clarify the record if the report: (1)

contains a conflict or ambiguity that must be resolved, (2) does not contain all the necessary

information, or (3) does not appear to be based on medically acceptable clinical and laboratory

diagnostic techniques. 20 C.F.R. § 404.1512(e)(1); *see also Johnson v. Comm'r of Soc. Sec.*, 529

F.3d 198, 205 (3d Cir. 2008). If the record is not adequately developed, remand for further

proceedings is appropriate. *Rutherford*, 399 F.3d at 557. The ALJ is only required to recontact a

medical source if the evidence is insufficient for the ALJ to make a decision. 20 C.F.R. §

404.1512(e).

     In the present matter, the ALJ concluded that Dr. Chervenak's opinion was inadequate to

determine whether Kelly was disabled because the opinion was unsigned and undated. (D.I. 15

at 22) To the extent that the ALJ determined that the signature and date were necessary to her

consideration of Dr. Chervenak's opinion, the ALJ had a duty to follow up with Dr. Chervenak

to obtain the information. The ALJ erred by failing to follow up on the inadequacies in the

information provided. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

     However, the ALJ's conclusion that Dr. Baker's opinion was not consistent with either

Dr. Chester's conclusions or Dr. Baker's own treatment notes did not give rise to a duty to

recontact Dr. Baker. "[T]he regulation makes clear that the ALJ only need re-contact the

---

[7] The Social Security Administration eliminated §§ 404.1512(e)(1) and 416.912(e)(1), effective March 26, 2012. *See generally* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012). The new protocol for recontacting medical sources is set forth in 20 C.F.R. §§ 404.1520b and 416.920b. *See Gray v. Astrue*, C.A. No. 10-507, 2012 WL 1521259, at *3 n.1 (E.D. Pa. May 1, 2012). Because this case arose prior to March 26, 2012, I

medical source when the evidence received from the medical source is inadequate to determine whether or not the claimant is disabled," not because the ALJ finds the doctor's opinion inconsistent with the claimant's medical records. *Ellow v. Astrue*, 2013 WL 159919, at \*8 (E.D. Pa. Jan. 15, 2013) (quoting *Becker v. Barnhart*, 2005 WL 747047, at \*5 (E.D. Pa. Apr. 1, 2005)). "[M]ost cases in this circuit have concluded that 'notwithstanding the deficiencies of a treating physician's opinion, the evidence on record remained adequate to reach a disability determination.'" *Thurman v. Barnhart*, 2007 WL 2728656, at \*7 (E.D. Pa. Sept. 18, 2007) (concluding that ALJ was not obligated to recontact treating physician to request an explanation of the inconsistency between his observations and his assessment).

Even if the ALJ had requested and obtained the additional information that she deemed necessary to reaching a disability determination, the ALJ failed to apply the required factors in deciding how much weight to accord a non-controlling treating physician's opinion. These factors include the treatment relationship, length of relationship, frequency of examination, nature and extent of the treatment relationship, supportability of the opinion afforded by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *Gonzalez*, 537 F. Supp. 2d at 661; *see* 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ did not indicate that any of these factors played a role in her decision to assign little weight to the opinions of Dr. Chervenak and Dr. Baker.

Accordingly, I recommend that the court remand the case to the Commissioner.

## IV. ORDER AND RECOMMENDED DISPOSITION

For the reasons stated above, I recommend that the court grant Kelly's motion for summary judgment (D.I. 19), deny the Commissioner's motion for summary judgment (D.I. 23),

---

apply the prior version.

and remand the matter for further analysis not inconsistent with this recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006). The objections and responses to the objections are limited to ten (10) pages each.

The parties are directed to the court's Standing Order In Non Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the court's website, www.ded.uscourts.gov.

Dated: September 18, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

32